# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW MEXICO

In re:   VAUGHAN COMPANY, REALTORS,                    Case No. 10-10759

      Debtor.

---

JUDITH A. WAGNER, Chapter 11 Trustee
Of the bankruptcy estate of the Vaughan Company,
Realtors,

      Plaintiff,

v.                                                                      Misc. No. 12-0006

ANTHONY OLIVA et al;                                    Adv. No. 11-1150
KENNETH J. EBERHARD et al.;                        Adv. No. 11-1226
PATRICIA PRUETT et al;                                 Adv. No. 11-1185
DEREK PINTADO et al;                                    Adv. No. 12-1004
DIANA GOLDEN, as personal representative for   Adv. No. 12-1010
the estate of Phil Lenk
MARGARET VALENCIA, as trustee of the          Adv. No. 12-1017
Henry Valencia Trust, dated August 19, 1994;
MEI-HUI MA;                                               Adv. No. 12-1023
LUANN SHYDOHUB;                                        Adv. No. 12-1028
STEPHAN MOFFAT;                                         Adv. No. 12-1050
LAURA RODRIGUEZ et al.;                             Adv. No. 12-1055
SHU HUI LEE;                                              Adv. No. 12-1056
WEY-ANN CHEN;                                           Adv. No. 12-1057
YUAN HSING CHEN;                                       Adv. No. 12-1060
JOSHUA LLOYD;                                           Adv. No. 12-1077
KATHLEEN ATENCIO;                                     Adv. No. 12-1098
PETER MCANENA et al.;                                Adv. No. 12-1109
ULTIMA HOMES, INC. et al.;                          Adv. No. 12-1110
KIMON LEE,                                               Adv. No. 12-1113
CRAIG FENTON et al.;                                  Adv. No. 12-1116
ADAM GRAY et al;                                       Adv. No. 12-1121
JOHN PETTY;                                              Adv. No. 12-1134
DAVID LANKFORD et al;                               Adv. No. 12-1139
COY WILSON et al;                                      Adv. No. 12-1065
DIANA GOLDEN et al;                                   Adv. No. 12-1294
WILLIAM CAMPBELL et al;                            Adv. No. 12-1295

      Defendants.

## MEMORANDUM OPINION

THIS MATTER is before the Court on the Plaintiff's Motion for Summary Judgment ("Motion for Summary Judgment" or "Trustee's Motion"). *See* Docket Nos. 49 & 50. In each of the above-captioned adversary proceedings, Plaintiff Judith Wagner, Chapter 11 Trustee of the bankruptcy estate of the Vaughan Company Realtors ("Trustee") seeks to recover certain payments made to the Defendants as fraudulent transfers pursuant to 11 U.S.C. § 548 and applicable state law. In her Motion, she seeks to prove certain elements of her prima facie case against each Defendant. After consideration of the Motion for Summary Judgment, the responses thereto, and the supporting papers, and being otherwise sufficiently informed, the Court finds that the Motion for Summary Judgment should be granted, in part.[1]

### SUMMARY JUDGMENT STANDARDS

Summary judgment, governed by Fed.R.Civ.P. 56, will be granted when the movant demonstrates that there is no genuine dispute as to a material fact and that the movant is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a), made applicable to adversary proceedings by Rule 7056, Fed.R.Bankr.P. "[A] party seeking summary judgment always bears the initial responsibility of informing the ... court of the basis for its motion, and ... [must] demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party seeking summary judgment must

---

[1] Among other things, the Trustee seeks a determination that VCR's promissory note program operated as a Ponzi scheme between 1994 and February, 2010 and was insolvent during that time. Because all of the transfers at issue occurred within four years before the petition date, the Court limited its analysis to the time period between 2005 and 2009/early 2010. Further, the Trustee seeks judgment in her favor on the grounds that the funds are not traceable as a result of extensive commingling. As discussed below, the Court determined that the transfers at issue were in furtherance of the Ponzi scheme and were made with the actual intent to defraud creditors. The Court therefore need not make any further determinations regarding whether, and to what extent, any particular investor's funds are traceable.

-2-

set forth by number all material facts the movant contends are not subject to genuine dispute and refer with particularity to the portions in the record upon which the movant relies. NM LBR 7056-1(b). In considering a motion for summary judgment, the Court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *Wolf v. Prudential Ins. Co. of America*, 50 F.3d 793, 796 (10th Cir. 1995) (quoting *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F2d 1238, 1241 (10th Cir. 1990)).

"[A] party opposing a properly supported motion for summary judgment may not rest on mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial" through affidavits or other supporting evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed .2d 202 (1986). Furthermore, New Mexico Local Bankruptcy Rule 7056-1(c) provides that the party opposing summary judgment must: 1) list the material facts as to which the party contends a genuine fact exists; 2) "refer with particularity to those portions of the record upon which the opposing party relies;" and 3) "state the number of the movant's fact that is disputed." NM LBR 7056-1(c). Properly supported material facts set forth in the movant's motion are "deemed admitted unless specifically controverted" by the party opposing summary judgment. NM LBR 7056-1(c).

SUMMARY OF CONSOLIDATED ISSUES

By an order entered December 6, 2012, the Court consolidated the above-captioned adversary proceedings for purposes of adjudicating certain elements of the Trustee's prima facie case. The consolidated issues include:

1. Whether any transfer at issue constituted an "interest of the debtor in property" under § 548(a)(1);

-3-

2. Whether any transfer at issue was made with the "actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted" under § 548(a)(1)(A);

3. If the Trustee alleged that a transfer was made representing an amount in excess of such Defendant's initial investment, whether the Debtor received "less than reasonably equivalent value in exchange for such transfers" under 11 U.S.C. § 548(a)(1)(B)(i);

4. Whether, with respect to any transfer or obligation, the Debtor "was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation" under § 548(a)(1)(B)(ii)(I);

5. Whether, with respect to any transfer, the Debtor "was engaged in business or a transaction or was about to engage in business or a transaction, for which any property remaining with the debtor was unreasonably small capital" under 11 U.S.C. § 548(a)(1)(B)(ii)(II);

6. Whether, with respect to any transfer, the Debtor "intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured" under § 548(a)(1)(B)(ii)(III);

7. Whether, with respect to any transfer, "the debtor made the transfer or incurred the obligation…with actual intent to hinder, delay or defraud any creditor of the debtor" under N.M.S.A. § 56-10-18(A)(1);

8. If the Trustee alleged that a transfer was made representing an amount in excess of such Defendant's initial investment, whether the Debtor "received reasonably equivalent value in exchange for such transfer or obligation" under N.M.S.A. §§ 56-10-18 (A)(2) and 56-10-19(A);

9. Whether, with respect to any transfer, the Debtor "was engaged or was about to engage in a business transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction" under N.M.S.A. § 56-10-18(A)(2)(a);

10. Whether, with respect to any such transfer, the Debtor "intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due" under N.M.S.A. § 56-10-18(A)(2)(b);

11. With regards to any transfer, whether the Debtor was "insolvent or became insolvent shortly after the transfer was made" under N.M.S.A. §§ 56-10-18(B)(9) and 56-10-19;

12. Whether the Debtor was involved in a Ponzi scheme, including the nature, extent, inception, and duration of the Ponzi scheme, if one existed; and

13. Any connection between the Ponzi scheme and the transfers at issue, including to the extent practical, any tracing issues relevant to the Trustee's prima facie case.

## FACTS NOT SUBJECT TO GENUINE DISPUTE

1.     Between 1972 and February, 2010, Douglas F. Vaughan ("Vaughan") was the chairman, chief executive officer, president, and majority owner of VCR.  *See* Plea Agreement attached to the Trustee's Motion as Exhibit B-2 (Docket No. 50-5) (the "Plea Agreement"), p. 12 of 27.[2]

2.     In or about 1993, Vaughan began a promissory note program in which he accepted money on behalf of VCR from investors in exchange for interest-bearing promissory notes (the "Note Program").  *Id.*

3.     The term of the notes varied but was typically three years.  *Id.*  The interest rate ranged from 8% to 40% per year.  *Id.*  Interest was generally paid in monthly installments.  *Id.* At the end of the term of a note, Vaughan caused the principal to be paid off or offered the investor the opportunity to "roll over" the principal into a new note at the same or higher interest rate.  *Id.*

4.     Vaughan induced persons to invest in the Note Program by claiming their investments would be used for legitimate business activities and misrepresenting the safety of the Note Program.  *See* Plea Agreement, p. 13-14 of 27.

5.     Vaughan used the proceeds from the Note Program for three undisclosed purposes: (a) to pay the interest and principal on promissory notes executed in favor of earlier investors; (b) to pay himself, either as salary, bonuses, or other personal transfers; and (c) to

---

[2] For an explanation as to why the Court considered the Plea Agreement, *see infra,* Discussion Section "I."

subsidize the corporate operations of VCR, which was generating insufficient "legitimate" real-estate related revenue to sustain itself. *Id.* at p. 14 of 27.

6.      By at least 2005, VCR's Note Program had become an important source of funding for VCR. *See* Plea Agreement, p. 15 of 27; Expert Report of Gil A. Miller attached to the Trustee's Motion as Exhibit C-1B (Docket No. 50-8) (the "Miller Report"), p. 10-15 of 47. The revenue VCR earned from its legitimate real estate operations was insufficient to pay its expenses and debts relating to those operations. *Id.* VCR's operating revenue was also insufficient to pay principal and interest payments due to investors during that time. *See* Plea Agreement, p. 17 of 27; Miller Report, p. 10 of 47.

7.      From at least January 1, 2005 through February, 2010, VCR financed its payment of purported principal or interest to existing investors through new investments in the Note Program. *See* Plea Agreement, p. 16 of 27; Affidavit of Gil A. Miller attached to the Trustee's Motion as Exhibit C-1 (Docket No. 50-6) (the "Miller Affidavit"), ¶ 10(d) and (e); Miller Report, p. 8 of 47. In fact, after VCR paid its operating expenses, funds received from new investors were the only source of revenue for making such payments or for paying referral fees during that period. *See* Miller Report, p. 10 of 47.

8.      VCR maintained a bank account at Charter Bank (the "Charter Account"). *See* Miller Report, p. 10 of 47; Affidavit of Judith Wagner attached to the Trustee's Motion as Exhibit D-1 (Docket No. 50-9) (the "Wagner Affidavit"), ¶ 4(ii). The Charter Account was VCR's primary bank account. *See* Miller Report, p. 10 of 47; Wagner Affidavit, ¶ 7.

9.      Vaughan used the Charter Account to manage the flow of money into and out of the Note Program. *See* Plea Agreement, p. 15 of 27; Miller Report, p. 10 of 4. All investments under the Note Program were deposited into the Charter Account, where they were comingled

-6-

with real estate commissions and other sources of VCR revenue. *See* Plea Agreement, p. 15 of 27. Vaughan also caused all interest and principal payments on the notes to be made from the Charter Account. *Id.*

10. Each of the transfers the Trustee seeks to avoid originated from the Charter Account. *See* Wagner Affidavit, ¶ 13.

11. Because of the fungible nature of money and the vast commingling of VCR's funds, it is not possible to trace an investor's funds after they were deposited into the Charter Account. *See* Miller Report, p. 11 of 47.

12. Investor funds were used to fund VCR's legitimate operations or to pay returns to VCR investors. *See* Plea Agreement, p. 15-17 of 27; Miller Report, p. 11 of 47.

13. Between May 2005 and February, 2010, Vaughan transferred approximately $4.5 million to himself from VCR's operating account, either as "shareholder loans" or as other disbursements. *See* Plea Agreement, p. 18 of 27; Miller Report, p. 13 of 47.

14. In any given year between 2005 and 2009, VCR had liabilities of not less than $32,229,363.37. *See* Plea Agreement, p. 16 of 27. The aggregate principal balance owed to note holders from 2005 to 2009 was approximately:

| 2005 | $32,229,363.37 |
| 2006 | $39,969,110.68 |
| 2007 | $49,984,845.80 |
| 2008 | $62,844,445.57 |
| 2009 | $74,386,623.38 |

*Id.*

15. Between 2005 and 2009, VCR had assets valued at not more than:[3]

| | |
|---|---|
| 2005 | $6,842,321 |
| 2006 | $7,129,479 |
| 2007 | $7,515,850 |
| 2008 | $6,680,841 |
| 2009 | $5,457,830 |

*See* Miller Report, Exhibit 5 thereto.

16. Between 2005 and 2009, VCR had taxable losses of approximately:

| | |
|---|---|
| 2005 | $5,600,000 |
| 2006 | $7,500,000 |
| 2007 | $9,900,000 |
| 2008 | $13,300,000 |
| 2009 | $13,900,000 |

*See* Plea Agreement, p. 16 of 27; Miller Report, p. 9-10 of 47.

17. Between 2005 and 2009, VCR had no income from operations available to pay investors after payment of operating expenses, and its distributions to investors exceeded its net income as follows:[4]

| Year | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|
| Net income from operations available to pay investors | (1,987,183) | (1,349,916) | (2,337,520) | (3,867,254) | (4,661,076) |
| Disbursements to investors | 6,473,377 | 10,599,281 | 11,407,674 | 14,431,480 | 16,880,790 |
| Distributions in excess of income | 8,460,560 | 11,949,197 | 13,754,194 | 18,298,734 | 21,541,866 |

*See* Miller Report, p. 10 of 47.

---

[3] These assets were owned by either VCR or the other "Consolidated Entities," which include the entities operated by Vaughan such as NAI The Vaughan Company Commercial Properties, Inc., Vaughan Property Management Company, and The Vaughan Referral Company. Vaughan transferred money between the Consolidated Entities and caused them to file joint consolidated tax returns.
[4] This assumes VCR used operating revenue to pay operating expenses before such funds were used to pay investors.

18.     VCR's real estate brokerage business produced no profits between at least 2000 and February 22, 2010, except a *de minimis* amount in 2004.  *See* Miller Report, p. 9 of 47; Miller Affidavit, ¶ 10(b).

19.     Between 2005 and 2010, VCR and the other Consolidated Entities maintained a negative equity position.  *See* Miller Report, p. 14-16 and Exhibit 5 thereto; Miller Affidavit, ¶ 10(m).  During that time, VCR and the other Consolidated Entities' ratio of total liabilities to total assets varied from 478% to 1,178%.  *See* Miller Report, p. 16 and Exhibit 5 thereto; Miller Affidavit, ¶ 10(n).  Further, disbursements to investors exceeded the income of VCR during that period.  *See* Miller Report, p. 13 of 47; Miller Affidavit, ¶ 10(k).

20.     VCR was highly leveraged compared to other real estate companies.  *See* Miller Report, p. 16 of 47; Miller Affidavit, ¶ 10.

21.     VCR was never audited by an independent accounting firm.  *See* Miller Report, p. 13 of 47; Miller Affidavit, ¶ 10(j).

22.     Prior to February 22, 2010, each of the Defendants were either: (a) an investor in VCR's Note Program, or received transfers on account of other investors' investments in the Note Program;[5] or (b) an investor described in section (a) above who also referred persons into VCR's Note Program and received compensation on account of such referrals.  *See* Wagner Affidavit, ¶ 10.

23.     Each of the transfers the Trustee seeks to avoid were made to either: (a) investors in VCR's Note Program on account of their investments; or (b) persons who referred others to

_____

[5] A number of Defendants received transfers pursuant to a will.   For example, the Trustee alleges that several Defendants in Adv. No. 12-1295 received transfers on account of their late mother's investment in the Note Program.

-9-

VCR's Note Program as compensation for such referrals. *See* Wagner Affidavit, ¶¶ 10 and 13 and the Complaints in each adversary proceeding.

24.     VCR compensated persons who referred others to the Note Program through payment of referral fees, preferential treatment, or other benefits. *See* Wagner Affidavit, ¶ 11. Referral fees generally ranged between 2% of 8% of the total amount paid by the new investor. *Id.*

25.     VCR transferred more than $720,000 in referral fees on account of certain individuals' solicitation efforts between 2000 and 2010. *See* Wagner Affidavit, ¶ 12.

26.     VCR filed a voluntary petition under Chapter 11 of the Bankruptcy Code on February 22, 2010 (the "Petition Date"). *See* Case No. 10-10759 (Docket No. 1).

27.     The Trustee was appointed on April 29, 2010. *See* Order Appointing Chapter 11 Trustee in Case No. 10-10759 (Docket No. 201). She was the only Trustee appointed in VCR's bankruptcy case.

28.     In 2011, Vaughan was charged with various criminal counts relating to whether he caused VCR to operate as a Ponzi scheme. *See generally* Plea Agreement. On December 21, 2011, he entered into the Plea Agreement with the United States Attorney for the District of New Mexico, whereby he admitted to operating the Note Program as a scheme to defraud investors. *Id.*

29.     In the Plea Agreement, Vaughan agreed to, among other things, serve not more than twenty years in prison and pay restitution as ordered by the court. *Id.* at 2 of 27.

30.     As of August, 2013, there were approximately 586 claims filed in VCR bankruptcy case (Case No. 10-10759) totaling $69,275,994.20. *See* Claims Register in Case No. 10-10759.

-10-

DISCUSSION

The Trustee seeks to recover transfers made by VCR to the Defendants under 11 U.S.C. §§ 544 and 548 and N.M.S.A. 1978 §§ 56-10-18 and 19. In her Motion for Summary Judgment, she argues that: (1) VCR's Note Program operated as a Ponzi scheme since 1994 and the transfers made pursuant to the scheme were made with the actual intent to hinder, delay, or defraud creditors; (2) VCR was insolvent since 1994; (3) VCR did not receive "reasonably equivalent value" for transfers made to Defendants in excess of their investments;[6] (4) the transfers at issue constitute an interest of the debtor in property; and (5) the investor funds were commingled and are not traceable.

Only a handful of Defendants[7] responded to the Trustee's Motion for Summary Judgment. Those who responded objected to the Court considering the Plea Agreement and the indictment of Vaughan and contended that they acted in good faith. The Court did not consider the indictment. The good faith defense is not at issue. The Court will address all remaining arguments below.

<u>I. Whether the Plea Agreement would be admissible at trial</u>

As an initial matter, several Defendants contend that the Court cannot rely on the Plea Agreement in connection with the Trustee's Motion because it contains hearsay which is not admissible under Fed.R.Evid. 803 or 804. Defendants are correct that the Plea Agreement is not admissible under any of the common exceptions to hearsay. Nevertheless, the Plea Agreement

_____

[6] Hereinafter, such Defendants may be referred to as "Net Winners," and the amount they received in excess of their investments may be referred to as "Net Winnings."
[7] Those Defendants include: William Campbell, *et al* (Adv. No. 12-1295); Ultima Homes, Inc., *et al* (Adv. No. 12-1110); Mei-Hui Ma (Adv. No. 12-1023); Shu Hui Lee (Adv. No. 12-1056); Wey-anny Chen (Adv. No. 12-1057); Yuan Hsing Chen (Adv. No. 12-1060); and LuAnn Shydohub (Adv. No. 12-1028).

-11-

would be admissible at trial under Fed.R.Evid. 807.  That rule, which is known as the "residual exception," provides:

> [a] statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Fed.R.Evid. 807.

The residual exception is to "be used very rarely, and only in exceptional circumstances." Wright & Miller, Federal Practice and Procedure § 7095 (2000).  Here, however, such circumstances exist.  The Plea Agreement is offered as evidence of material facts (*i.e.* that Vaughan operated a Ponzi scheme and that VCR was insolvent); Vaughan's admissions are more probative on these issues than any other evidence the Trustee could procure; and as Vaughan specifically contemplated that the Plea Agreement would be used in the bankruptcy case, the interests of justice are best served by its admission.  Further, courts routinely admit plea agreements under Rule 807, particularly when they are offered against the perpetrator of a Ponzi scheme.  *See In re Slatkin,* 525 F.3d 805, 811-813 (9th Cir. 2008) (affirming admission of a plea agreement entered into by a Ponzi scheme perpetrator).[8]  In *Thomas v. Durastanti,* 607 F.3d 655, 666 n. 8 (10th Cir. 2010), the Tenth Circuit cited *Slatkin* with approval and determined that "to

---

[8] *See also In re Bayou Group, LLC,* 396 B.R. 810, 835 (S.D.N.Y.2008) ("Courts have consistently found that criminal proceeding admissions of a fraudulent scheme to defraud investors made in guilty pleas and plea allocutions are admissible …."); *In re Rothstein Rosenfeldt Adler, P.A.,* 2010 WL 5173796, *5 (Bankr.S.D.Fla. 2010) ("Criminal plea agreements are admissible to establish the existence of a Ponzi scheme and a wrongdoer's fraudulent intent."); *In re National Consumer Mortg. LLC,* 2013 WL 164247, *12 (D.Nev. 2013) ("A plea agreement in which the defendant admits he ran a Ponzi scheme is admissible under Federal Rule of Evidence 807, the residual hearsay exception."); *Cf Scholes v. Lehmann,* 56 F.3d 750, 762 (7th Cir. 1995) (Ponzi scheme perpetrator's plea agreement was admissible hearsay under Rule 803(22) in trustee's fraudulent transfer action).

-12-

the extent [defendant's] plea agreement is offered to prove his intent and is thus hearsay, it is admissible under Fed.R.Evid. 807." The Court will therefore rely on Vaughan's admissions in the Plea Agreement in determining whether to grant the Trustee's Motion for Summary Judgment.

## II. Whether the transfers were made with the actual intent to defraud creditors

The Trustee seeks judgment in her favor on the grounds that the transfers at issue were made with the actual intent to defraud creditors because VCR operated the Note Program as a Ponzi scheme. The actual fraud provision found in 11 U.S.C. § 548(a)(1) provides, in relevant part:

> The trustee may avoid any transfer ... that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily-
>> (A) made such transfer ... with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made ... indebted.

11 U.S.C. § 548(a)(1). Similarly, N.M.S.A.1978 § 56-10-18(A)(1) includes the requirement that the debtor made the transfer "with actual intent to hinder, delay or defraud any creditor of the debtor."

### A. Whether VCR operated as a Ponzi scheme

When there is sufficient evidence of a Ponzi scheme, the "actual intent to defraud" element necessary to recover a transfer under either § 548(a)(1)(A) or applicable state law can be established based on a "Ponzi scheme presumption." *See Wagner v. Pruett,* 477 B.R. 206, 218 (Bankr. D.N.M. 2012) (citing *Perkins v. Haines*, 661 F.3d 623, 626 (11th Cir. 2011) ("With respect to Ponzi schemes, transfers made in furtherance of the scheme are presumed to have been made with the intent to defraud for purposes of recovering the payments under §§ 548(a) and

-13-

544(b).").[9]   Under this rule, it is presumed that "any transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay, or defraud creditors." *In re The 1031 Tax Group, LLC*, 439 B.R. 47, 72 (Bankr. S.D.N.Y. 2010) (internal quotations omitted).

A Ponzi scheme is defined as an investment program "in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments.  Typically, investors are promised large returns for their investments.  Initial investors are actually paid the promised returns, which attract additional investors." *In re Hedged-Investments Associates, Inc.*, 48 F.3d 470, 471 n. 2 (10th Cir.1995).  In a typical Ponzi scheme: (1) the debtor receives funds from investors (which can include parties loaning money to generate a return); (2) investors are promised large returns for their investments; (3) initial investors are actually paid the promised returns, which attracts additional investors; (4) returns to investors are not financed through the success of the underlying business venture, if any, but are taken from principal sums received from newly attracted investments; and (5) the debtor induces investments through an illusion of paying returns to investors from legitimate business activities.  *See Pruett*, 477 B.R. at 219; Kathy Bazoian Phelps and Hon.

---

[9] *See also In re AFI Holding, Inc*., 525 F.3d 700, 704 (9th Cir.2008) ("'[T]he mere existence of a Ponzi scheme' is sufficient to establish actual intent under 548(a)(1) or a state's equivalent to that section.") (quoting *In re Agricultural Research and Tech. Group, Inc.*, 916 F.2d 528, 535 (9th Cir.1990)); *S.E.C. v. Resource Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir.2007) ("In this circuit, proving that IERC operated as a Ponzi scheme establishes the fraudulent intent behind the transfers it made."); *In re Dreier LLP*, 452 B.R. 391, 424 (Bankr.S.D.N.Y.2011) (stating that "[c]ourts have uniformly recognized a presumption of actual intent to defraud on the part of the transferor in the context of a Ponzi scheme."); *In re Independent Clearing House Co*., 77 B.R. 843, 860 (D.Utah 1987) (stating that "[o]ne can infer an intent to defraud future undertakers from the mere fact that a debtor was running a Ponzi scheme. Indeed, no other reasonable inference is possible.").

-14-

Steven Rhodes, *The Ponzi Book: A Legal Resource for Unraveling Ponzi Schemes*, § 2.03[1][b] (2012).

This case presents a textbook example of a Ponzi scheme. In the Plea Agreement Vaughan admitted that, beginning in at least 2005: (1) VCR financed its payment of principal and interest to prior investors through funds borrowed from new investors rather than from profits from the underlying real estate business; (2) he induced people to invest in the Note Program by representing that the investments were made to finance VCR's legitimate business activities and by misrepresenting the safety of the Note Program; (3) he diverted investors' funds for his personal use; and (4) he administered the Note Program as a scheme and artifice to defraud investors. It is also undisputed that VCR received funds from the Defendants, who were promised returns ranging from 8% to 40% for their investments. As with other investors, each Defendant was paid promised returns, and several Defendants referred additional investors to the Note Program in exchange for referral fees exceeding $700,000. None of the Defendants presented evidence to rebut the Ponzi presumption. Based on these facts, it is clear that - beginning in at least 2005 - VCR operated the Note Program as a Ponzi scheme.

  A. *Whether the Trustee has sufficiently connected the relevant transfers to the Ponzi scheme*

In addition to proving the existence of a Ponzi scheme, the movant must sufficiently connect the relevant transfers to the Ponzi scheme. *See Perkins*, 661 F.3d at 626 (noting that transfers must be made "in furtherance of the [Ponzi] scheme" to prove actual intent to defraud); *In re 1031 Tax Group, LLC*, 439 B.R. 37, 72 (Bankr. S.D.N.Y. 2010) ("For the Ponzi scheme presumption to apply, the transfers must have been made *in connection with* a Ponzi scheme.") (emphasis added). If a plaintiff demonstrates that payments to particular investors were made in furtherance of the Ponzi scheme, he or she need not demonstrate a traceable relationship between

-15-

a particular investment and money paid out to other investors. *See Carroll v. Stettler*, 2010 WL 4611450, \*2 (E.D.Pa. 2010) (declining to require such a traceable relationship and collecting cases).

Here, the facts not subject to genuine dispute sufficiently satisfy this requirement. Each transfer the Trustee seeks to recover was made on account of each Defendant's (or prior transferee's) investment in the Note Program or as compensation for referring others to the Note Program. Further, between 2005 and 2009, funds received from new investors was VCR's only source of revenue to pay existing investors. Although VCR had negative cash flow from operations ranging from approximately $1.35 million to $4.65 million per year during that time, it paid between approximately $6.5 million and $16.75 million per year in investment returns or referral fees. It is therefore clear that the payments of principal and interest to investors were made from other investors' funds. As the referral fees enabled VCR to attract new investors and continue to pay returns on prior investments, those fees were also made in furtherance of the Ponzi scheme. *See, e.g., Zazzali v. AFA Financial Group, LLC,* 2012 WL 4903593, \*1 (Bankr.D.Del. 2012) (noting that "commissions that propped up the [Ponzi] scheme were [necessarily] made in furtherance of that scheme").[10]

Because VCR's transfers to investors in the Note Program, as well as its transfers made as compensation for referring others to the Note Program, were made in furtherance of the Ponzi scheme, the Court concludes that VCR made such transfers with the actual intent to defraud its creditors.

_____

[10] *See also In re DBSI*, 476 B.R. 413, 423 (Bankr.D.Del. 2012) (noting that commissions and referral fees would generally be made in furtherance of the Ponzi scheme because the scheme is dependant upon the sale of promissory notes to generate cash flow); *In re World Vision Entm't, Inc*., 275 B.R. 641, 658 (Bankr.M.D.Fla.2002) (Commissions paid to brokers who sold promissory notes were fraudulent transfers where the note sales were the primary source of funding for the Ponzi scheme).

-16-

### III. Whether the VCR was insolvent and/or intended
### to incur debts beyond its ability to repay as they became due

Next, the Trustee seeks to establish insolvency and/or the alternative tests under the

Bankruptcy Code and the New Mexico Fraudulent Transfer Act ("UFTA"). Pursuant to 11

U.S.C. § 548(a)(1)(B)(ii)(I), the trustee may avoid a transfer if, among other things, the debtor

"was insolvent on the date that such transfer was made or such obligation was incurred, or

became insolvent as a result of such transfer or obligation." "The Bankruptcy Code defines

insolvency as a 'financial condition such that the sum of such entity's debts is greater than all of

such entity's property, at fair valuation,' exclusive of exempt property and fraudulent transfers of

a type not at issue here." *In re Sherman*, 2001 WL 997946, *2 (10th Cir. 2001) (quoting 11

U.S.C. § 101(32)). Section 548(a)(1)(B)(ii)(I) requires a showing that the debtor is "balance

sheet insolvent," meaning that the debtor's liabilities exceed the debtor's assets. *See In re*

*Solomon*, 299 B.R. 626, 638 (10th Cir. BAP 2003) (noting that the Bankruptcy Code and the

UFTA apply the "balance sheet" test for determining insolvency, *i.e.* whether liabilities exceed

assets at fair valuation).[11]

Similarly, N.M.S.A.1978 §§ 56-10-18 (B) and 56-10-19 require that the debtor was

insolvent at the time of the transfer, or became insolvent as a result of the transfer. The state law

articulation of the insolvency element is the functional equivalent of the insolvency requirement

under 11 U.S.C. § 548(a)(1)(B)(ii)(I). *See Solomon*, 299 B.R. at 633 (observing that the

insolvency elements under the Oklahoma UFTA and § 548 are identical); *In re Tiger Petroleum*

*Co.*, 319 B.R. 225, 232 (Bankr.N.D.Okla.2004) (finding that "[t]he language of UFTA and § 548

---

[11] *See also In re Gonzales,* 2011 WL 2619609, *3 (Bankr.D.N.M. 2011) (adopting the balance sheet test for insolvency); *Wagner v. Cunningham,* 481 B.R. 752, 763 (Bankr. D.N.M. 2012) (same).

are nearly identical" and that "the same analysis applies under both laws") (citations omitted).

Under Section § 56-10-18(A)(2) of the UFTA, a transfer is fraudulent as to present and future

creditors if, among other things, the debtor:

> (a) was engaged or about to engage in a business transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (b) Intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

N.M.S.A.1978 § 56-10-18(A)(2).

The facts not subject to genuine dispute and supporting evidence show that between at

least January 1, 2005 and the Petition Date, VCR was hopelessly insolvent.  During that time,

VCR and the other Consolidated Entities maintained a negative equity position; those entities'

ratio of liabilities to assets was at least 478%.  Further, based on the aggregate principal balance

owed to note holders from 2005 to 2009, VCR's liabilities were not less than: (1) $32,229,363.37

in 2005; (2) $39,969,100.68 in 2006; (3) $49,984,845.80 in 2007; (4) $62,844,445.57 in 2008;

and (5) $74,386,623.38 in 2009.  Because the facts reference both VCR and the other

Consolidated Entities, the exact value of VCR's assets in each of those years is unclear.

However, even if VCR were credited with all of the assets owned by either it or the other

Consolidated Entities, and VCR's liabilities were limited to debts owed to investors in the Note

Program, VCR would still be insolvent during each of the four years preceding the Petition Date.

Exhibit 5 to the Miller Report demonstrates that the value of VCR's assets did not exceed: (1)

$6,842,321 in 2005; (2) $7,129,479 in 2006; (3) $7,515,850 in 2007; (4) $6,680,841 in 2008; and

(5) $5,457,830 in 2009.  Thus, in any given year between 2005 and 2009, VCR's liabilities

exceeded the value of its assets by at least $25 million.  Based on the fact that VCR's liabilities

exceeded its assets by roughly $68 million in 2009 and the trajectory of VCR's deepening

insolvency between 2005 and 2009, the Court reasonably infers that VCR was also insolvent in between January 1, 2009 and the Petition Date.

Further, a number of courts have held that Ponzi scheme operators necessarily "intend[] to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due." *Donell v. Kowell*, 533 F.3d 762, 770-771 (9th Cir. 2008); *Armstrong v. Collins,* 2010 WL 1141158, *21 (S.D.N.Y. 2010) (proof that a transfer was made pursuant to a Ponzi scheme generally satisfies that alternative tests to insolvency contained in most state law fraudulent transfer statutes).[12]  Under the circumstances of this case, the Court agrees.  Vaughan admitted that by 2005, VCR was hemorrhaging money and that he could not make principal or interest payments without soliciting new funds from investors.  *See* Undisputed Fact No. 6; Plea Agreement, p. 15 of 27.  At the time, VCR's liabilities exceeded its assets by at least $25 million.  VCR's real estate business had no profits, and it suffered annual losses.  Nevertheless, between 2005 and 2009, VCR continued to issue millions of dollars of promissory notes each year along with various assurances that the investment was a safe bet.  In light of these facts, the Court concludes that between at least January 1, 2005 and the Petition Date, VCR believed or reasonably should have believed that it was incurring debts beyond its ability to pay as they became due.

---

[12] *See also In re M & L Business Mach. Co., Inc.,* 155 B.R. 531, 540 (Bankr.D.Colo. 1993) ("A Ponzi scheme cannot work forever. … The perpetrator … must know all along, from the very nature of his activities, that investors at the end of the line will lose their money.") (quoting *In re Independent Clearing House Co.,* 77 B.R. 843, 860 (D.Utah 1987)); *In re Nat'l Liquidators, Inc.,* 232 B.R. 915, 919 (Bankr.S.D.Ohio 1998) ("While the Debtor's intent to incur debts that were beyond its ability to pay is not known specifically, it can be inferred as a result of the debtor's continuous insolvency and operation of a Ponzi scheme."); *In re Canyon Systems Corp.,* 343 B.R. 615, 650 (Bankr.S.D.Ohio 2006) ("Although determinations of subjective intent are generally not appropriate by way of summary judgment, given the undisputed evidence that Canyon was operating a Ponzi scheme from the time it commenced operations, the Court may find as a matter of law that the Debtor intended to incur debts beyond its ability to repay.")

The Trustee has therefore established insolvency under the Bankruptcy Code and the UFTA and has satisfied the requirements of N.M.S.A.1978 § 56-10-18(A)(2).

### *IV. Whether VCR received less than reasonably equivalent value for Net Winnings*

The Trustee also seeks to establish that, as a matter of law, VCR received less than reasonably equivalent value for any transfers that constitute Net Winnings. Constructive fraud under 11 U.S.C. § 548(a)(1)(B) requires the plaintiff to establish that the debtor "received less than a reasonably equivalent value in exchange for the transfer." 11 U.S.C. § 548(a)(1)(B)(i). The constructive fraud provisions of the UFTA contain a similar requirement.[13] The Trustee bears the burden of demonstrating that VCR received less than a reasonably equivalent value in exchange for the Net Winnings. *See In re Keffer,* 2004 WL 632875, *2 (10th Cir. BAP 2004) (Under Section 548, "the trustee has the burden to prove … that the debtor received less than a reasonably equivalent value in exchange for the transfer.").[14]

"Value" is defined under 11 U.S.C. § 548(d)(2)(A) as "property, or satisfaction or securing of a present or antecedent debt of the debtor." 11 U.S.C. § 548(d)(2)(A). "Debt" is defined as "liability on a claim," and "claim" is broadly defined as the "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, legal, equitable, secured, or unsecured," and includes the "right to an equitable remedy for breach of performance." 11 U.S.C. § 101(5) and (12).

---

[13] N.M.S.A.1978 §§ 56-10-18(A)(2) and 56-10-19 require that the debtor make a transfer "without receiving a reasonably equivalent value in exchange for the transfer."

[14] *See also In re Young,* 141 F.3d 854, 857 (8th Cir. 1998) (noting that the Trustee has the burden of proving the "reasonably equivalent value element" of his or her fraudulent transfer claim); *In re Kinderknecht*, 470 B.R. 149, 169 (Bankr.D.Kan.2012) (stating that the Chapter 7 trustee, as the party seeking to set aside a transfer as constructively fraudulent, bears the burden of proving that the debtor received less than a reasonably equivalent value); *In re Hannover Corp.,* 310 F.3d 796, 802 (5th Cir. 2002) (same).

-20-

In the context of a Ponzi scheme, "reasonably equivalent value" can take two forms. As the Court explained more fully in *Wagner v. Pruett*, the investor may elect to rescind the entire contract, in which case reasonably equivalent value takes the form of a reduction in the amount of a restitution claim by the transferee against the transferor. 477 B.R. 206, 223 (Bankr.D.N.M. 2012) (citing *Jobin v. McKay (In re M & L Business Machine Co.)*, 84 F.3d 1330, 1341 (10th Cir.1996)). In such a case, the transferor (*i.e.* the Ponzi perpetrator) receives reasonably equivalent value as a matter of law for any payments it made up to the amount of the transferee's (*i.e.* investor's) initial investment. *Id.*[15]

Alternatively, an investor may elect to "affirm the entire contract and recover the difference between actual value of the benefits received and the value of those benefits if they had been as represented." *In re Hedged-Investments Associates, Inc.*, 84 F.3d 1286, 1289-1290 (10th Cir. 1996) (citing Colorado law).[16] In such a case, the Ponzi perpetrator receives reasonably equivalent value for any returns paid pursuant to a valid, enforceable contract. *Id.* (suggesting that a transferor receives reasonably equivalent value where the transferor and transferee have a valid, enforceable contract for the payment of returns); *In re Independent Clearing House Co.*, 77 B.R. 843, 857 (D.Utah 1987) ("[W]hether the debtors were indebted to a defendant for amounts in excess of his undertaking depends on whether or not the defendant had

---

[15] For an in depth discussion as to why reasonably equivalent value can take the form of a reduction in the amount of a restitution claim, *see* Wagner v. Pruett, 477 B.R. 233 (Bankr.D.N.M. 2012).

[16] Although the Tenth Circuit relied on Colorado law in *Hedged-Investment Associates,* New Mexico courts have also acknowledged a promisee's right to either rescind or affirm their contract. *See, e.g., Sapir v. Ewing,* 63 N.M. 401, 405, 320 P.2d 751 (1958) (noting that once a party elects to affirm their contract, the right to rescind is lost).

-21-

a valid, enforceable right under his contract with the debtors to receive payments of so-called earnings.").[17]

Here, the Trustee only seeks to establish that VCR received less than reasonably equivalent value for any Net Winnings paid to the Defendants. For investors who have affirmed their contracts, whether VCR received reasonably equivalent value in exchange for the transfer of Net Winnings depends on whether they had a valid, enforceable contract with VCR for the payment of amounts beyond their initial investment. *See Independent Clearing House Co.,* 77 B.R. at 857; *Taubman*, 160 B.R. at 985. The Trustee argues that any contract for the payment of Net Winnings stemming from a Ponzi scheme contravenes public policy and is therefore unenforceable.

The Tenth Circuit has examined this issue through the lens of Colorado law. In *Hedged-Investments Associates*, the Tenth Circuit determined that, "as a matter of public policy, the contract [to pay returns on a Ponzi investment] was unenforceable to the extent it purported to give [the investor] … a right to payments in excess of her undertaking." 84 F.3d at 1290 (internal quotations omitted). The Tenth Circuit observed:

> To allow an investor to enforce his contract to recover promised returns in excess if his investment would be to further the debtors' fraudulent scheme at the expense of other investors. Any recovery would not come from the debtors' own assets because they had no assets they could legitimately call their own. Rather, any award of damages would have to be paid out of money rightfully belonging to other victims of the Ponzi scheme.

*Id.* (quoting *Independent Clearing House,* 77 B.R. at 858).

---

[17] *See also In re Taubman,* 160 B.R. 964, 985 (Bankr.S.D.Ohio 1993) ("whether the Debtor was indebted to a defendant for amounts in excess of the original amount invested or loaned depends on whether or not the defendant had a valid, enforceable right under the contract with the Debtor to receive payments in excess of the amount given to the Debtor.").

-22-

The Court is convinced that New Mexico law yields the same result. New Mexico courts routinely refuse to enforce certain portions of contracts where the offending portions contravene public policy and the contract is of a type where public policy does not render it entirely void. *See, e.g., Fiser v. Dell Computer Corporation,* 144 N.M. 464, 188 P.3d 1215 (2008) (declining to enforce portions of a contract which were contrary to public policy); *Figueroa v. THI of New Mexico at Casa Arena Blanca, LLC,* 2013-NMCA-077, ¶ 18 306 F.3d 480, 488 (Ct.App. 2012) (examining whether "the unfair terms of [a] contract … warrant enforcement").[18] As the Tenth Circuit aptly explained in *Hedged-Investments Associates,* Net Winners can only enforce their contractual rights at the expense of other innocent investors. The Court believes that the New Mexico Supreme Court, if presented with the issue, would decline to enforce promises under notes to pay Net Winnings.

The Court concludes that: (1) the Net Winners do not have valid rescission claims to the extent of their Net Winnings; and (2) VCR did not have a valid, enforceable contractual obligation to pay any returns in excess of the Defendants' initial investment. Consequently, VCR received less than reasonably equivalent value as a matter of law for the transfers of Net Winnings.[19]

_____

[18] *See also Holguin v. Fulco Oil Services, L.L.C.,* 149 N.M. 98, 101, 245 P.3d 42, 45 (Ct.App. 2010) (examining whether certain provisions in a contract were enforceable in light of public policy)*; Piña v. Gruy Petroleum Mgmt. Co*., 139 N.M. 619, 136 P.3d 1029 (determining that choice-of-law provision of contract was void as against public policy).

[19] Whether VCR received less than reasonably equivalent value for any transfers to the Defendants up the amount of their initial investments is not at issue here. However, the Court reiterates its conclusion in *Pruett* that, to the extent the transfers from VCR constituted repayments of the Defendants' original investment, VCR received reasonably (if not perfectly) equivalent value for those transfers if the investor acted in good faith.

-23-

### V. Whether VCR had an interest in the transferred funds

Finally, the Trustee seeks to establish that each transfer constituted a "transfer of an interest of the debtor in property" for purposes of 11 U.S.C. §§ 544(b) and 548(a)(1). Courts generally view the terms "interest of the debtor in the property" and "property" broadly in the bankruptcy context. *In re Ogden*, 314 F.3d 1190, 1197 (10th Cir. 2002). "'Property of the debtor subject to [Sections 544, 547, and 548] is best understood as that property that would have been part of the estate had it not been transferred before the commencement of [the case].'" *Id.* at 1197 (quoting *In re Bullion Reserve of North America*, 836 F.2d 1214, 1217 (9th Cir.1988)). For purposes of most bankruptcy proceedings, "'[p]roperty interests are created and defined by state law,'" while bankruptcy law governs the extent to which that interest is property of the estate. *Id.* (quoting *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979)).

The Court previously addressed this issue in *Wagner v. Wilson,* 2013 WL 960143 (Bankr.D.N.M. 2013). The Court determined that, under New Mexico law, a person who obtains property by fraud acquires a legal interest in the property and may convey good title to a bona fide purchaser for value. *See O'Brian v. Chandler*, 107 N.M. 797, 800, 765 P.2d 1165, 1168 (1988) (under the Uniform Commercial Code, a buyer of goods obtained by fraud acquires voidable title and may convey good title to a bona purchaser for value). *See also State ex rel. State Tax Commission v. Garcia*, 77 N.M. 703, 708, 427 P.2d 230, 234 (1967) (a deed obtained by fraud is voidable, not void, and cannot be voided upon a sale of the property to a good-faith bona fide purchaser); *Kokoricha v. Estate of Keiner*, 148 N.M. 322, 328, 236 P.3d 41, 47 (Ct. App. 2010) (same). The perpetrator of the fraud obtains a voidable interest in the property, which qualifies as a legally recognized interest of defeasible title in the property. *Cf. Cornell v. Albuquerque Chemical Co., Inc.*, 92 N.M. 121, 123, 584 P.2d 168, 170 (Ct. App. 1978)

-24-

("Defeasible title" is title that is "liable to be annulled or made void, but not one that is already void or an absolute nullity."), abrogated on other grounds by *Albuquerque Concrete Coring Co. v. Pan Am Servs., Inc.,* 118 N.M. 140, 879 P.2d 772 (1994). As the Court explained more fully in *Wagner v. Wilson,* a debtor's interest of defeasible title in property constitutes property of the estate under Section 541 and is therefore an "interest of the debtor in property" for purposes of Sections 544(b) and 548.

Here, it is undisputed that all investments in the Note Program were deposited into VCR's account at Charter Bank, and all returns to investors were paid from that account. Once the funds were deposited into the Charter Account, VCR obtained a legally recognized interest of defeasible title to the funds. Under *Odgen*, the funds would have therefore been property of the VCR bankruptcy estate pursuant to Section 541 had the funds not been transferred before the commencement of the case. Consequently, payment of such funds to the Defendants constituted the transfer of an interest of VCR in property within the meaning of Sections 544(b) and 548.[20]

## CONCLUSION

Based on the foregoing, the Trustee's Motion for Summary Judgment will be granted, in part. The Court will enter judgment in the Trustee's favor on the grounds that: (1) each of the transfers at issue were made with the actual intend to defraud creditors; (2) between at least January 1, 2005 and the Petition Date, VCR was insolvent and intended to incur debts beyond its ability to pay; (3) VCR received less than reasonably equivalent value in exchange for the transfer of Net Winnings; and (4) each of the transfers at issue constituted a transfer of an

---

[20] In *In re Marshall,* 550 F.3d 1251 (10th Cir. 2008), the Tenth Circuit - applying Kansas law - used the "dominion and control" test to determine whether certain transfers constituted an "interest of the debtor in property" within the meaning of 11 U.S.C. § 547. Here, VCR deposited each investor's funds in the Charter Account and exercised control over them until they were paid out to other investors or otherwise disposed of. Therefore, under the theories expounded in both *Odgen* and *Marshall,* the result is the same.

-25-

interest of the debtor in property.  The Court will enter a separate judgment and order consistent with this Memorandum Opinion.

_____
ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket:  October 23, 2013

All counsel of record via CM/ECF, and:

Derek Pintado
1247 Smallman St.
Pittsburgh, PA, 15222-4239

Brett Pintado
1247 Smallman St.
Pittsburgh, PA, 15222-4239

David Lankford
4243 E. Montgomery Rd.
Cave Creek, AZ 85331

Lee Ann Lankford
4243 E. Montgomery Rd.
Cave Creek, AZ 85331

Kathleen Atencio
10340 Flagstaff Dr. NW
Albuquerque, NM 87114

Luann Shydohub
6426 Santolina Dr.
Albuquerque, NM 87120

Sarah Blackwood
45120 Hwy 79 S., 706
Aguanga, California, 92536

-26-

Peter McAnena
45120 Hwy 79 S., 706
Aguanga, California, 92536