UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re:   VAUGHAN COMPANY, REALTORS,                            Case No. 10-10759

     Debtor.

---

JUDITH A. WAGNER, Chapter 11 Trustee
Of the bankruptcy estate of the Vaughan Company,
Realtors,

     Plaintiff,

v.                                                             Misc. No. 12-0006

MARGARET VALENCIA, as trustee of the                           Adv. No. 12-1017
Henry Valencia Trust, dated August 19, 1994;
PETER MCANENA et al.;                                          Adv. No. 12-1109
CRAIG FENTON et al.;                                           Adv. No. 12-1116

     Defendants.

## MEMORANDUM OPINION

THIS MATTER is before the Court on the Plaintiff's Motion for Summary Judgment ("Motion for Summary Judgment" or "Trustee's Motion"). *See* Docket Nos. 52 and 53. In each of the above-captioned adversary proceedings, Plaintiff Judith Wagner, Chapter 11 Trustee of the bankruptcy estate of the Vaughan Company Realtors ("Trustee") seeks to recover payments made to the Defendants as preferential transfers pursuant to 11 U.S.C. § 547(b). In her Motion, she seeks to prove certain elements of her prima facie case against each Defendant. After consideration of the Motion for Summary Judgment, the responses thereto, and the supporting papers, and being otherwise sufficiently informed, the Court finds that the Motion for Summary Judgment should be granted, in part, and denied, in part.

1

## SUMMARY JUDGMENT STANDARDS

Summary judgment, governed by Fed.R.Civ.P. 56, will be granted when the movant demonstrates that there is no genuine dispute as to a material fact and that the movant is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a), made applicable to adversary proceedings by Rule 7056, Fed.R.Bankr.P. "[A] party seeking summary judgment always bears the initial responsibility of informing the ... court of the basis for its motion, and ... [must] demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party seeking summary judgment must set forth by number all material facts the movant contends are not subject to genuine dispute and refer with particularity to the portions in the record upon which the movant relies. NM LBR 7056-1(b). In considering a motion for summary judgment, the Court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *Wolf v. Prudential Ins. Co. of America*, 50 F.3d 793, 796 (10th Cir. 1995) (quoting *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F2d 1238, 1241 (10th Cir. 1990)).

"[A] party opposing a properly supported motion for summary judgment may not rest on mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial" through affidavits or other supporting evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed .2d 202 (1986). Furthermore, New Mexico Local Bankruptcy Rule 7056-1(c) provides that the party opposing summary judgment must: 1) list the material facts as to which the party contends a genuine fact exists; 2) "refer with particularity to those portions of the record upon which the opposing party relies;" and 3) "state the number of the movant's fact that is disputed." NM LBR 7056-1(c). Properly supported

material facts set forth in the movant's motion are "deemed admitted unless specifically controverted" by the party opposing summary judgment. NM LBR 7056-1(c).

## SUMMARY OF CONSOLIDATED ISSUES

By an order entered December 6, 2012, the Court consolidated the above-captioned adversary proceedings for purposes of adjudicating certain elements of the Trustee's prima facie case. The consolidated issues include, among other things:[1]

> 1. Whether any transfer at issue constituted an "interest of the debtor in property" under § 547(b)
>
> 2. Whether any transfer at issue was made "to or for the benefit of a creditor" under § 547(b)(1);
>
> 3. Whether any transfer at issue was made "for or on account of an antecedent debt owed by the debtor before such transfer was made" under § 547(b)(2);
>
> 4. Whether any transfer at issue was made while the debtor was insolvent under § 547(b)(3);
>
> 5. Whether any transfer at issue enabled the transferee to received more than the creditor would receive if: (a) the case were a case under Chapter 7 of the Bankruptcy Code; (b) the transfer had not been made; and (c) such creditor received payment of such debt to the extent provided by the provisions of this title under § 547(b)(5);
>
> 6. Whether VCR was involved in a Ponzi scheme, including the nature, extent, inception, and duration of the Ponzi scheme, if one existed; and
>
> 7. Any connection between the Ponzi scheme and the transfers at issue, including to the extent practical, any tracing issues relevant to the Trustee's prima facie case.

## FACTS NOT SUBJECT TO GENUINE DISPUTE

1. Between 1972 and February, 2010, Douglas F. Vaughan ("Vaughan") was the chairman, chief executive officer, president, and majority owner of VCR. *See* Plea Agreement

---

[1] The Court addressed the remaining consolidated issues in its memorandum opinion entered October 23, 2013, docketed under Misc. Case No. 12-0006 (the "Companion Opinion").

3

Case 12-00006-j    Doc 78    Filed 10/25/13    Entered 10/25/13 14:04:45 Page 3 of 19

attached to the Trustee's Motion as Exhibit B-2 (Docket No. 50-5) (the "Plea Agreement"), p. 12 of 27.[2]

2. In or about 1993, Vaughan began a promissory note program in which he accepted money on behalf of VCR from investors in exchange for interest-bearing promissory notes (the "Note Program"). *Id*.

3. The term of the notes varied but was typically three years. *Id.* The interest rate ranged from 8% to 40% per year. *Id.* Interest was generally paid in monthly installments. *Id.* At the end of the term of a note, Vaughan caused the principal to be paid off or offered the investor the opportunity to "roll over" the principal into a new note at the same or higher interest rate. *Id.*

4. Vaughan induced persons to invest in the Note Program by claiming their investments would be used for legitimate business activities and misrepresenting the safety of the Note Program. *See* Plea Agreement, p. 13-14 of 27.

5. Vaughan used the proceeds from the Note Program for three undisclosed purposes: (a) to pay the interest and principal on promissory notes executed in favor of earlier investors; (b) to pay himself, either as salary, bonuses, or other personal transfers; and (c) to subsidize the corporate operations of VCR, which was generating insufficient "legitimate" real-estate related revenue to sustain itself. *Id.* at p. 14 of 27.

6. By at least 2005, VCR's Note Program had become an important source of funding for VCR. *See* Plea Agreement, p. 15 of 27; Expert Report of Gil A. Miller attached to the Trustee's Motion as Exhibit C-1B (Docket No. 50-8) (the "Miller Report"), p. 10-15 of 47.

---

[2] For an explanation as to why the Court considered the Plea Agreement, *see* the Companion Opinion, p. 11-13.

4

The revenue VCR earned from its legitimate real estate operations was insufficient to pay its expenses and debts relating to those operations. *Id.* VCR's operating revenue was also insufficient to pay principal and interest payments due to investors during that time. *See* Plea Agreement, p. 17 of 27; Miller Report, p. 10 of 47.

7. From at least January 1, 2005 through February, 2010, VCR financed its payment of purported principal or interest to existing investors through new investments in the Note Program. *See* Plea Agreement, p. 16 of 27; Affidavit of Gil A. Miller attached to the Trustee's Motion as Exhibit C-1 (Docket No. 50-6) (the "Miller Affidavit"), ¶ 10(d) and (e); Miller Report, p. 8 of 47. In fact, after VCR paid its operating expenses, funds received from new investors were the only source of revenue for making such payments or for paying referral fees during that period. *See* Miller Report, p. 10 of 47.

8. VCR maintained a bank account at Charter Bank (the "Charter Account"). *See* Miller Report, p. 10 of 47; Affidavit of Judith Wagner attached to the Trustee's Motion as Exhibit D-1 (Docket No. 50-9) (the "Wagner Affidavit"), ¶ 4(ii). The Charter Account was VCR's primary bank account. *See* Miller Report, p. 10 of 47; Wagner Affidavit, ¶ 7.

9. Vaughan used the Charter Account to manage the flow of money into and out of the Note Program. *See* Plea Agreement, p. 15 of 27; Miller Report, p. 10 of 4. All investments under the Note Program were deposited into the Charter Account, where they were comingled with real estate commissions and other sources of VCR revenue. *See* Plea Agreement, p. 15 of 27. Vaughan also caused all interest and principal payments on the notes to be made from the Charter Account. *Id.*

10. Each of the transfers the Trustee seeks to avoid originated from the Charter Account. *See* Wagner Affidavit, ¶ 13.

5

11. Because of the fungible nature of money and the vast commingling of VCR's funds, it is not possible to trace an investor's funds after they were deposited into the Charter Account. *See* Miller Report, p. 11 of 47.

12. Investor funds were used to fund VCR's legitimate operations or to pay returns to VCR investors. *See* Plea Agreement, p. 15-17 of 27; Miller Report, p. 11 of 47.

13. Between May 2005 and February, 2010, Vaughan transferred approximately $4.5 million to himself from VCR's operating account, either as "shareholder loans" or as other disbursements. *See* Plea Agreement, p. 18 of 27; Miller Report, p. 13 of 47.

14. In any given year between 2005 and 2009, VCR had liabilities of not less than $32,229,363.37. *See* Plea Agreement, p. 16 of 27. The aggregate principal balance owed to note holders from 2005 to 2009 was approximately:

| | |
|---|---|
| 2005 | $32,229,363.37 |
| 2006 | $39,969,110.68 |
| 2007 | $49,984,845.80 |
| 2008 | $62,844,445.57 |
| 2009 | $74,386,623.38 |

*Id.*

15. Between 2005 and 2009, VCR had assets valued at not more than:[3]

| | |
|---|---|
| 2005 | $6,842,321 |
| 2006 | $7,129,479 |
| 2007 | $7,515,850 |
| 2008 | $6,680,841 |
| 2009 | $5,457,830 |

*See* Miller Report, Exhibit 5 thereto.

16. Between 2005 and 2009, VCR had taxable losses of approximately:

---

[3] These assets were owned by either VCR or the other "Consolidated Entities," which include the entities operated by Vaughan such as NAI The Vaughan Company Commercial Properties, Inc., Vaughan Property Management Company, and The Vaughan Referral Company. Vaughan transferred money between the Consolidated Entities and caused them to file joint consolidated tax returns.

|      |             |
|------|-------------|
| 2005 | $5,600,000  |
| 2006 | $7,500,000  |
| 2007 | $9,900,000  |
| 2008 | $13,300,000 |
| 2009 | $13,900,000 |

*See* Plea Agreement, p. 16 of 27; Miller Report, p. 9-10 of 47.

17. Between 2005 and 2009, VCR had no income from operations available to pay investors after payment of operating expenses, and its distributions to investors exceeded its net income as follows:[4]

| Year | 2005 | 2006 | 2007 | 2008 | 2009 |
|------|------|------|------|------|------|
| Net income from operations available to pay investors | (1,987,183) | (1,349,916) | (2,337,520) | (3,867,254) | (4,661,076) |
| Disbursements to investors | 6,473,377 | 10,599,281 | 11,407,674 | 14,431,480 | 16,880,790 |
| Distributions in excess of income | 8,460,560 | 11,949,197 | 13,754,194 | 18,298,734 | 21,541,866 |

*See* Miller Report, p. 10 of 47.

18. VCR's real estate brokerage business produced no profits between at least 2000 and February 22, 2010, except a *de minimis* amount in 2004. *See* Miller Report, p. 9 of 47; Miller Affidavit, ¶ 10(b).

19. Between 2005 and 2010, VCR and the other Consolidated Entities maintained a negative equity position. *See* Miller Report, p. 14-16 and Exhibit 5 thereto; Miller Affidavit, ¶ 10(m). During that time, VCR and the other Consolidated Entities' ratio of total liabilities to total assets varied from 478% to 1,178%. *See* Miller Report, p. 16 and Exhibit 5 thereto; Miller

---

[4] This assumes VCR used operating revenue to pay operating expenses before such funds were used to pay investors.

Affidavit, ¶ 10(n). Further, disbursements to investors exceeded the income of VCR during that period. *See* Miller Report, p. 13 of 47; Miller Affidavit, ¶ 10(k).

20. VCR was highly leveraged compared to other real estate companies. *See* Miller Report, p. 16 of 47; Miller Affidavit, ¶ 10.

21. VCR was never audited by an independent accounting firm. *See* Miller Report, p. 13 of 47; Miller Affidavit, ¶ 10(j).

22. Prior to February 22, 2010, each of the Defendants were either: (a) an investor in VCR's Note Program, or received transfers on account of other investors' investments in the Note Program;[5] or (b) an investor described in section (a) above who also referred persons into VCR's Note Program and received compensation on account of such referrals. *See* Wagner Affidavit, ¶ 10.

23. Each of the transfers the Trustee seeks to avoid were made to either: (a) investors in VCR's Note Program on account of their investments; or (b) persons who referred others to VCR's Note Program as compensation for such referrals. *See* Wagner Affidavit, ¶¶ 10 and 13 and the Complaints in each adversary proceeding.

24. VCR compensated persons who referred others to the Note Program through payment of referral fees, preferential treatment, or other benefits. *See* Wagner Affidavit, ¶ 11. Referral fees generally ranged between 2% of 8% of the total amount paid by the new investor. *Id.*

25. VCR transferred more than $720,000 in referral fees on account of certain individuals' solicitation efforts between 2000 and 2010. *See* Wagner Affidavit, ¶ 12.

---

[5] A number of Defendants received transfers pursuant to a will. For example, the Trustee alleges that several Defendants in Adv. No. 12-1295 received transfers on account of their late mother's investment in the Note Program.

26. VCR filed a voluntary petition under Chapter 11 of the Bankruptcy Code on February 22, 2010 (the "Petition Date"). *See* Case No. 10-10759 (Docket No. 1).

27. The Trustee was appointed on April 29, 2010. *See* Order Appointing Chapter 11 Trustee in Case No. 10-10759 (Docket No. 201). She was the only Trustee appointed in VCR's bankruptcy case.

28. In 2011, Vaughan was charged with various criminal counts relating to whether he caused VCR to operate as a Ponzi scheme. *See generally* Plea Agreement. On December 21, 2011, he entered into the Plea Agreement with the United States Attorney for the District of New Mexico, whereby he admitted to operating the Note Program as a scheme to defraud investors. *Id.*

29. In the Plea Agreement, Vaughan agreed to, among other things, serve not more than twenty years in prison and pay restitution as ordered by the court. *Id.* at 2 of 27.

30. Cherie Fenton invested in VCR's Note Program. *See* Plaintiff's First Request for Admissions, Interrogatories, and Requests for Production to Cherie Fenton attached to the Trustee's Motion as Exhibit H (Docket No. 54-10) ("Cherie Discovery Responses"), p. 5 of 19. VCR made payments to Cherie Fenton on account of her participation in the Note Program. *Id.* Cherie Fenton admitted that each of those payments reduced an antecedent debt. *Id.* at p. 14 of 19.

31. Norman Fenton invested in VCR's Note Program. *See* Plaintiff's First Request for Admissions, Interrogatories, and Requests for Production to Norman Fenton attached to the Trustee's Motion as Exhibit I (Docket No. 54-11) ("Norman Discovery Responses"), p. 5 of 19. VCR made payments to Norman Fenton on account of his participation in the Note Program. *Id.*

9

Norman Fenton admitted that each of those payments reduced an antecedent debt. *Id.* at p. 13-14 of 19.

32. Craig Fenton invested in VCR's Note Program. *See* Plaintiff's First Request for Admissions, Interrogatories, and Requests for Production to Craig Fenton attached to the Trustee's Motion as Exhibit E (Docket No. 54-7) ("Craig Discovery Responses"), p. 5 of 20. VCR made payments to Craig Fenton on account of his participation in the Note Program. *Id.* Craig Fenton admitted that each of those payments reduced an antecedent debt. *Id.* at p. 13-14 of 20.

33. The Henry Valencia Trust dated August 19, 1994 (the "Valencia Trust"), acting through Margaret Valencia, as power of attorney for Henry Valencia and successor trustee of the Valencia Trust, invested in VCR's Note Program. *See* Plaintiff's First Request for Admissions, Interrogatories, and Requests for Production to the Valencia Trust attached to the Trustee's Motion as Exhibit F (Docket No. 54-8) ("Valencia Discovery Responses"), p. 6, 14 of 20; Valencia's Answer to Complaint filed in Adv. No. 12-1017, p. 2 of 3. VCR made payments to the Valencia Trust on account of its participation in the Note Program. *Id.* The Valencia Trust admitted that each of those payments reduced an antecedent debt. *Id.* at p. 14 of 20.

34. On August 6, 2010, Cherie Fenton filed a proof of claim in VCR's bankruptcy case in the amount of $248,000 for "money loaned" to VCR pursuant to the note program. *See* Claim No. 363-2 in Case No. 10-10759.

35. On August 6, 2010, Norman Fenton filed a similar claim in the amount of $340,000. *See* Claim No. 364-2 in Case No. 10-10759.

36. Peter McAnena received transfers from VCR on account of his participation in the Note Program. *See* Plaintiff's First Request for Admissions, Interrogatories, and Requests for

Production to Peter McAnena attached to the Trustee's Motion as Exhibit E (Docket No. 54-7) ("McAnena's Discovery Responses"), p. 5 of 20.

  37. Promissory notes VCR issued as part of the Note Program were purportedly secured by a Deed of Trust containing property Vaughan owned in his personal capacity. *See* Plea Agreement, p. 12 of 27. The notes were also purportedly secured by a personal guarantee signed by Vaughan in his individual capacity. *Id.* at p. 13 of 27.

## DISCUSSION

  The Trustee seeks to recover transfers made by VCR to the Defendants under 11 U.S.C. § 547. In her Motion for Summary Judgment, she argues that: (1) VCR had an interest in the transferred monies; (2) the transfers were made pursuant to a Ponzi scheme; (3) the transfers were made while VCR was insolvent; (4) each Defendant was a creditor of VCR; (5) the transfers were on account of an antecedent debt; and (6) the transfers enabled each Defendant to received more than they would have received in a Chapter 7 liquidation had the transfers not been made. None of the Defendants responded to the Trustee's Motion.

  In its Companion Opinion, this Court determined that: (1) VCR operated as a Ponzi scheme since at least 2005; (2) VCR made transfers to the Defendants in furtherance of the Ponzi scheme with the actual intent to defraud creditors; (3) any transfers VCR made of "Net Winnings" were made for less than reasonably equivalent value in exchange for the transfers; (4) VCR had an interest in all funds transferred pursuant to the Note Program between January 1, 2005 and the Petition Date;[6] and (5) VCR was insolvent between at least January 1, 2005 and the

---

[6] The Companion Opinion addressed whether the transfers constituted an interest of VCR in property for purposes of Section 548. *See* p. 24-25. "Interest of the debtor in property," as that phrase is used in Section 547(b), is coextensive with "interests of the debtor in property" as that phrase as used in 11 U.S.C. §§ 541 and 548. *See In re Odgen,* 314 F.3d 1190, 1197 (10th Cir. 2002). For the reasons

11

Petition Date. Because the Court has already entered partial summary judgment in favor of the Trustee on those issues, it need not address them now. The Court will discuss the remaining issues below.

### *I. Whether the payments to Defendants constitute avoidable preferential transfers*

Preferential transfers are governed by 11 U.S.C. § 547(b), which provides, in relevant part:

> [T]he trustee may avoid any transfer of an interest of the debtor in property-
>
>> (1) to or for the benefit of a creditor;
>> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>> (3) made while the debtor was insolvent;
>> (4) made-(A) on or within 90 days before the date of the filing of the petition;[7]
>> (5) that enables such creditor to receive more than such creditor would receive if-
>>> (A) the case were a case under chapter 7 of this title;
>>> (B) the transfer had not been made; and
>>> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

The purpose of Section 547 is two-fold: "(1) "to secure an equal distribution of assets among creditors of like class and (2) to discourage actions by creditors that might prematurely compel the filing of a [bankruptcy] petition." *In re Marshall,* 550 F.3d 1251, 1254 (10th Cir. 2008). The Trustee bears the burden of proving all of the necessary elements to establish a preferential payment under 11 U.S.C. § 547(b). *See* 11 U.S.C. § 547(g) (providing that "the trustee has the burden of proving the avoidability of a transfer under subsection (b) ...").[8]

---

articulated in the Companion Opinion and in *Wagner v. Wilson,* 2013 WL 960143 (Bankr.D.N.M.), the Court therefore concludes that VCR had an interest in the transferred funds pursuant to Section 547(b).

[7] The timing and amount of each transfer is not at issue here. The Trustee filed separate a motion for summary judgment in each adversary proceeding to establish that element.

[8] *See also In re Robinson Bros. Drilling, Inc.,* 6 F.3d 701, 703 (10th Cir.1993) (recognizing that "[u]nder 11 U.S.C. § 547(g), a trustee seeking to avoid an allegedly preferential transfer under § 547(b) 'has the

Case 12-00006-j    Doc 78    Filed 10/25/13    Entered 10/25/13 14:04:45 Page 12 of 19

*A. Whether each payment was made to a creditor of VCR on account of an antecedent debt*

The Bankruptcy Code defines "creditor" broadly as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." 11 U.S.C. § 101(10)(A). A claim is similarly defined in broad terms by the Code as a:

> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or
>
> (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured[.]

11 U.S.C. § 101(5). As the Tenth Circuit explained, whether someone is a "creditor" within the meaning of Section 547(b)(1) depends on "whether [they] had any kind of right to payment from [the debtor] on account of" the debtor's pre-petition conduct. *In re Odgen,* 314 F.3d 1190, 1200 (10th Cir. 2002). "The term 'debt' means liability on a claim." 11 U.S.C. § 101. A debt is "antecedent" within the meaning of Section 547(b)(2) "if it [wa]s incurred before the [relevant] transfer.'" *Gonzales v. Wagner,* 2013 WL 2476375, *5 (D.N.M. 2013) (internal quotations omitted). *See also In re Bridge Info. Sys.*, 474 F.3d 1063, 1066-67 (8th Cir.2007) (An "antecedent debt" is a debt "incurred before the allegedly preferential transfer.").[9]

Thus, in order to satisfy the requirements of Sections 547(b)(1) and (2), the Trustee must show that each Defendant had a right to payment from VCR (*i.e.* a claim) at the time they received the preferential payments. If the Defendant did not have a claim against VCR at the

---

burden of proving by a preponderance of the evidence every essential, controverted element resulting in the preference.'") (quoting 4 Collier on Bankruptcy ¶ 547.21[5] at 547-93 (15th ed.1993)).

[9] *See also In re Ramba, Inc.,* 416 F.3d 394, 399 (5th Cir. 2005) ("A debt is 'antecedent" for purposes of § 547(b) if it was incurred before the alleged preferential transfer."); *In re Tanner Family, LLC,* 556 F.3d 1194, 1196 (11th Cir. 2009) ("A debt is 'antecedent' to the transfer sought to be avoided under § 547(b) if it is *pre-existing* or is incurred *before* the transfer.") (emphasis in original).

13

time VCR made the payments, such payments would not have been on account of an antecedent debt and would not be recoverable as preferential transfers.[10]

Here, the facts not subject to material dispute establish that Cherie, Norman, and Craig Fenton and the Valencia Trust were "creditors" of VCR who received note payments from VCR on account of an antecedent debt. Cherie and Norman Fenton filed claims against the bankruptcy estate. Further, all four Defendants admitted that each payment they received from VCR was on account of an antecedent debt. The Trustee has therefore satisfied the requirements of Sections 547(b)(1) and (2) as to Cherie, Norman, and Craig Fenton and the Valencia Trust.

The issue of whether Peter McAnena and Sarah Blackwood were "creditors" of VCR at the time of the challenged transfers requires further analysis. Although here the Trustee contends that Mr. McAnena was not paid in full by VCR for the money he invested in the Note Program, elsewhere she has maintained that Mr. McAnena and Ms. Blackwood were paid principal and interest in excess of their original investments (*i.e.* "Net Winnings").[11] *See, e.g.*, Exhibit A-1 attached to the Trustee's motion for summary judgment on consolidated issues relating to fraudulent transfers filed August 30, 2013 (Docket No. 50-1) under Misc. Case No. 12-0006.

As the Court explained more fully in the Companion Opinion and in *Wagner v. Pruett*, 477 B.R. 206 (Bankr. D.N.M. 2012), there are two types of claims that investors can assert against VCR based on nonpayment under a note issued as part of the Note Program. The investor may have: (1) a contractual right to payment under the note; or (2) a right to assert an

---

[10] The Trustee also asserted fraudulent transfer claims against the Defendants. Even if the payments are not recoverable as preferential transfers, they may be recoverable as fraudulent transfers.

[11] Hereinafter, Defendants who received more than the amount of their initial investment may be referred to as "Net Winners," and Defendants who received less than the amount of their initial investment may be referred to as "Net Losers."

14

equitable claim for rescission. *See* Companion Opinion, p. 21-23. Regardless of which claim the investor chooses to pursue, such claims are only valid to the extent the investor seeks to recover the initial investment. *Id.* Thus, an investor does not have a claim against the Ponzi-perpetrator - either under a contract or rescission theory - for money promised in excess of the investment. *Id.* In the context of preferential transfers, this means that an investor ceases to be a "creditor" of the Ponzi perpetrator at the moment the investor recovers the amount of the initial investment.

Here, whether Peter McAnena or Sarah Blackwood had a claim against (and were therefore creditors of) VCR at the time of the challenged transfers depends on whether they received Net Winnings during the preference period. If those Defendants received Net Winnings during the 90 days prior to the Petition Date, those transfers would not be avoidable as preferential transfers because at that point, VCR had no obligation to pay the funds. Instead, the Trustee would be required to recover those funds as fraudulent transfers. If, however, those Defendants received transfers that did not constitute Net Winnings during the preference period, those funds would be paid to a "creditor" for purposes of Section 547(b)(1). In such a case, VCR would also be satisfying a pre-petition debt to the Defendants as required by Section 547(b)(2).

The Trustee has established that Cherie, Norman, and Craig Fenton and the Valencia Trust are creditors who received payments from VCR on account of an antecedent debt for purposes of Sections 547(b)(1) and (2). However, because it is unclear whether Peter McAnena and Sarah Blackwood were creditors of VCR on the date of the challenged transfers, the Motion must be denied, in part, as to those Defendants. The Court will determine whether payments to Peter McAnena and Sarah Blackwood during the preference period were made to "creditors" on

15

account of an antecedent debt at their individual trial or on a separate motion for summary judgment if the dispositive motions deadline is extended for that purpose.

### B. Whether each Defendant "received more" than in a Chapter 7 case

Under Section 547(b)(5), the Trustee must establish that the transfers at issue enabled the creditor to receive "more from the challenged payments than it would have in a Chapter 7 liquidation," had the payments not been made. *In re Castletons, Inc.,* 990 F.2d 551, 554 (10th Cir. 1993). The focus of this section is "the status of the bankruptcy estate at the time of the filing of the petition." *Id.* Thus, the relevant inquiry is "not ... what the situation would have been if the debtor's assets had been liquidated and distributed among his creditors at the time the alleged preferential payment was made, but ... the actual effect of the payment as determined when bankruptcy results." *Id.* (quoting *Palmer Clay Prods. Co. v. Brown*, 297 U.S. 227, 229, 56 S.Ct. 450, 451, 80 L.Ed. 655 (1936)).

When an estate is insolvent, "any payment … to a[] [non-priority] unsecured creditor during the preference period will enable that creditor to receive more than he [or she] would have in liquidation had the payment not been made." *See In re Walker,* 389 B.R. 746, 749 (Bankr.D.Colo. 2008) (quoting *In re Lewis W. Shurtleff, Inc.*, 778 F.2d 1416, 1421 (9th Cir.1985)); *In re Chattanooga Wholesale Antiques, Inc*., 930 F.2d 458, 465 (6th Cir. 1991) ("Unless the estate is sufficient to provide a 100% distribution, any unsecured creditor ... who receives a payment during the preference period is in a position to receive more than it would have received under a Chapter 7 liquidation.").[12] On the other hand, "payments to a fully

---

[12] *See also In re Rocor Intern., Inc.,* 352 B.R. 319, 330 (Bankr.W.D.Okla. 2006) ("[S]o long as the distribution to unsecured creditors in a bankruptcy case is less than 100%, "any payment on account to an unsecured creditor during the preference period will enable that creditor to receive, for preference-avoidance purposes, more than it would have received in a hypothetical chapter 7 liquidation had the payment not been made.") (quoting *In re AppOnline.com, Inc*., 315 B.R. 259, 281 (Bankr.E.D.N.Y.2004);

16

secured creditor will not be considered preferential because the creditor would not receive more than in a chapter 7 liquidation." *Castletons,* 990 F.2d at 554 (quoting 4 Collier on Bankruptcy ¶ 547.08, at 547-43 (Lawrence P. King ed., 15th ed. 1993)).

Based on the undisputed facts and supporting evidence, the Court reasonably infers that, to the extent they held any claim at all when the challenged transfers were made, each Defendant held a non-priority unsecured claim against VCR. VCR perpetrated a Ponzi scheme in which it deceived investors into believing their investments were safe and/or secured when in fact they were not. In his Plea Agreement, Vaughan admitted that each note was secured by a deed of trust granted by Vaughan (not VCR) containing property owned by him in his personal capacity. He also admitted that the promissory notes were purportedly supported by a personal guarantee (signed in his personal capacity) that he provided to each investor. There is no evidence that the notes were secured by VCR's property. Thus, even if each note was actually secured as promised, the Defendants would potentially qualify as secured creditors of *Vaughan's* bankruptcy estate, not *VCR's* bankruptcy estate. Because VCR's estate was insolvent during the preference period, the Defendants received more than they would have in a Chapter 7 case had the transfers not been made.

The Trustee has therefore satisfied the requirements of Section 547(b)(5) as to each Defendant.

## CONCLUSION

Based on the foregoing, the Trustee's Motion for Summary Judgment will be granted, in part, and denied, in part. The Court will enter judgment in the Trustee's favor on the grounds

---

*In re Western Integrated Networks, LLC,* 2006 WL 2460702, *3 (10th Cir. BAP 2006) ("It is axiomatic that a debtor with fewer assets than liabilities does not have the ability to pay all of its unsecured creditors in full in liquidation. There simply is not enough money to go around; it is a matter of mathematics.").

17

that: (1) each of the transfers at issue were made in furtherance of a Ponzi scheme; (2) between at least January 1, 2005 and the Petition Date, VCR was insolvent; (3) each of the transfers at issue constituted a transfer of an interest of the debtor in property; (4) the transfers enabled each Defendant to receive more than they would have received in a Chapter 7 liquidation had the transfers not been made; and (5) Cherie Fenton, Norman Fenton, Craig Fenton, and the Valencia Trust were creditors of VCR who received transfers on account of an antecedent debt. The Court will deny the Trustee's Motion to the extent she seeks to establish that Peter McAnena and Sarah Blackwood were creditors of VCR who received transfers on account of an antecedent debt. The Court will enter a separate judgment and order consistent with this Memorandum Opinion.

_____
ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket: October 25, 2013

COPY TO:

Sarah Blackwood
45120 Hwy 79 S., 706
Aguanga, California, 92536

Peter McAnena
45120 Hwy 79 S., 706
Aguanga, California, 92536

Craig Fenton
5300 Hayes Dr. NW
Albuquerque, NM 87120

Michael K Daniels
PO Box 1640
Albuquerque, NM 87103-1640

19